**UNITED STATES of America,**

v.

**Jeffrey STEIN, et al., Defendants.**

**No. S1 05 Crim. 0888(LAK).**

United States District Court,
S.D. New York.

Oct. 12, 2007.

Rita Marie Glavin, Jonathan Samuel Kolodner, U.S. Atty's Office, S.D.N.Y., Glen Garrett McGorty, John Michael Hillebrecht, U.S. Atty., S.D.N.Y., New York City, for plaintiff.

John B. Harris, Stillman, Friedman & Schechtman, P.C., New York City, for KPMG LLP.

## MEMORANDUM AND ORDER

LEWIS A. KAPLAN, District Judge.

Defendants are charged with conspiring to defraud the United States and multiple counts of tax evasion based on a series of allegedly fraudulent tax shelters. The background of this case is fully set forth in the Court's prior opinions, familiarity with which is assumed.[1]

The government seeks to introduce in the trial of the four remaining defendants, pursuant to Fed.R.Evid. 404(b), "other act" evidence relating to (1) uncharged tax shelters, (2) side payments from defendants Larson and Pfaff to defendant Ruble, and (3) personal tax evasion by Messrs. Ruble, Pfaff, and Greenberg.[2] As the proponent of the evidence, the government has the burden of establishing admissibility.[3]

*The Trial*

As an initial matter, it is important to understand the context in which the government seeks to offer this other act evidence.

This, according to the government, is the largest criminal tax case in U.S. history. Although the case has been dismissed as to thirteen defendants, and the government will not press nineteen counts of the indictment against the remaining defendants, four defendants await trial on twenty-seven counts.[4] The government propos-

---

1. *E.g., United States v. Stein,* 488 F.Supp.2d 350 (S.D.N.Y.2007) (deciding defendants' motion to compel production of materials from government); *United States v. Stein,* 429 F.Supp.2d 633 (S.D.N.Y.2006) (denying defendants' motion to dismiss, to transfer, and to strike portions of indictment).

2. DI 809. The Court's July 16, 2007 opinion [DI 1134] renders the government's motion moot with regard to many transactions and parties, and the government abandoned its motion to introduce evidence pertaining to the Skandia transaction. Tr., May 8, 2007, 5:6–8.

3. *United States v. Camacho,* 353 F.Supp.2d 524, 535 (S.D.N.Y.2005) (citing *Bourjaily v. United States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987))

4. There is one charge of an overarching conspiracy and twenty-six substantive tax evasion counts.

es to call approximately 70 witnesses and to offer over 1,200 exhibits consisting of over 128,000 pages. Its most recent estimate is that its case-in-chief will take approximately three months to present. The defendants estimate that they will need forty percent or more again for their cases-in-chief and cross-examination. No one has addressed the duration of any rebuttal case or the time needed for opening statements and closing argument. We thus are on the threshold of a trial of at least four and quite possibly five or more months' duration.

The subject matter at issue is complex. The indictment revolves around four different tax shelters called FLIP ("Foreign Leveraged Investment Program"), OPIS ("Offshore Portfolio Investment Strategy"), BLIPS ("Bond Linked Issue Premium Structure"), and SOS ("Short Option Strategy"), each of which allegedly employed sham transactions to generate phony tax losses.[5] In order to evaluate the evidence, it appears that the jury will be called upon to understand complex structures and documents and probably to resolve difficult questions as to the economic realities of the transactions. Compounding this difficulty will be the fact that the government maintains that legal opinion letters with respect to the likelihood that these transactions would pass IRS scruti-

ny were fraudulent in that, among other things, they failed accurately to portray the transactions as they in fact were implemented. The jury therefore will be called upon to resolve difficult questions as to the correspondence, or lack thereof, between the factual premises of allegedly fraudulent tax opinions and the underlying facts of the transactions.

Indeed, the government in substance has acknowledged the complexity of the evidence involved in proving these transactions. The Court is in the process of sealed *Curcio*[6] proceedings to address issues raised in relation to a cooperating witness. In the course of those proceedings, the government produced a document purporting to recount statements made (a) to two Assistant United States Attorneys [AUSAs] not previously involved in the intricacies of this case (b) by the witness (c) about statements the witness made at an earlier meeting with certain attorneys (d) that described, perhaps among other things, BLIPS or aspects of BLIPS. In substance, the document indicates that the witness told the two AUSAs that he described the transactions at the earlier meeting in a manner that, the government suggests, demonstrated that the transactions were shams, although it is not sug-

---

**5.** It would prolong this order unduly to elaborate at length on the structures and issues presented by the four shelters. Indications of the complexity, however, are available in a prior opinion of this Court, opinions of another district court, and the report of the Senate Permanent Subcommittee on Investigations. *See United States v. Stein*, 482 F.Supp.2d 360, 362 (S.D.N.Y.2007) (FLIP and OPIS alleged to have involved taxpayer-clients entering into alleged "investment transactions" with Cayman Islands entities by purchasing purported warrants or entering into purported swaps); *Klamath Strategic Invest. Fund LLC v. United States*, 472 F.Supp.2d 885, 891–93 (S.D.Tex.2007) (describing structure of cer-

tain BLIPS shelters, which allegedly involved taxpayer contributions to limited liability companies treated as partnerships, non-recourse alleged multi-million dollar premium loans, assignment of loans to others, swap agreements, "synthetic dollar deposits," and withdrawal from partnerships); Senate Permanent Subcommittee on Investigations, *The Role of Professional Firms in the U.S. Tax Shelter Industry* 50–68 (Feb. 8, 2005) (describing development and execution of shelters).

**6.** *United States v. Curcio*, 680 F.2d 881 (2d Cir.1982).

gested that the witness used that word.[7] The government now, however, says that this is not what the witness told the AUSAs, It explained this inconsistency by stating in essence that the two AUSAs misunderstood what the witness told them because they did not understand the transactions sufficiently to comprehend what the witness in fact now is said to have told them:

> "With all respect to [the AUSAs], they don't know anything about these transactions. They don't know anything about what would be significant about what was said in a meeting. And for them to be able to have a nuanced understanding of the significance of what [the witness] told them . . ., is asking too much of anybody who hasn't tried to figure these things out." [8]

Surely if two experienced AUSAs could not get the transactions straight, the risk of juror confusion is obvious.

Against that background, the Court proceeds to consider the government's other act evidence.

*Evidence of Uncharged Tax Shelters*

■ 1. The government argues that evidence relating to uncharged tax shelters is admissible to show knowledge or intent. To carry its burden of establishing admissibility, the government must explain the uncharged transactions, identify similarities between the charged and uncharged transactions, and articulate how the similarities identified support an inference of knowledge or intent.[9] At the initial oral argument on this motion, the Court made clear that the government had not carried its burden,[10] it nonetheless gave it an opportunity to submit additional briefing. But even this second round of briefing offered only imprecise explanations of why the uncharged transactions were fraudulent and cursory assertions of alleged similarities. And while the record is very sketchy, it is reasonably clear that the uncharged and charged transactions differ in many respects that undermine any inference of intent or knowledge.[11]

Even if the government had carried its burden under Rule 404(b), Rule 403 considerations counsel exclusion. This evidence risks confusion of the issues and undue delay in a trial that promises to be complex and lengthy even in the absence of any Rule 404(b) evidence. The government attempts to minimize the prejudicial effect of this evidence by arguing that proof of the uncharged shelters would be simple and short.[12] But the government is unduly optimistic. It could not avoid tackling the complicated task of explaining the transactions because its probative value, if any, would be contingent upon establishing sufficient similarity.

■ 2. The government argues that evidence of uncharged transactions is ad-

---

7. Tr., Oct 11, 2007, 33:18–35:9.

8. *Id.* 35:10–17.

9. *United States v. Aminy*, 15 F.3d 258, 260 (2d Cir.1994) (quoting *United States v. Peterson*, 808 F.2d 969, 974 (2d Cir.1987)); *United States v. Afjehei*, 869 F.2d 670, 674 (2d Cir. 1989); *United States v. Baljit*, 207 F.Supp.2d 118, 122 (S.D.N.Y.2002) (citing *United States v. Gordon*, 987 F.2d 902, 908 (2d Cir.1993)).

10. After argument, the Court concluded that the government had not explained "what the proof [it] wants to offer is," how that proof

"establishes that anybody did anything wrong," or how the proof is "relevant to this case." Tr. May 8, 2007, 70:20–71:10.

11. For example, the shelters relied on different sections of the Code and used different maneuvers to trigger the purported losses.

12. Government's Memorandum in Support of Rule 404(b) Motion [DI 809] ("Gov't Mem.") at 37–39.

missible to show relationships among alleged co-conspirators. Although this is an appropriate not-for-character purpose under Rule 404(b),[13] it is not sufficient for admissibility. The government must show also that the evidence is relevant and that its probative value is not outweighed substantially by its unfair prejudice.

The government has not explained its assertions that these relationships are relevant and that the evidence is probative of them,[14] much less why it is necessary or helpful to get into the details of these other transactions beyond simply adducing evidence that the alleged coconspirators in fact had prior relationships involving uncharged transactions.

Even if the Court were to assume that this evidence would be probative of relationships that are relevant, Rule 403 considerations again would counsel exclusion. The government seeks to prove up each of these transactions to show the relevant relationships. That will take time, as will the defendants' inevitable responses, whether by cross-examination alone or by affirmative proof as well. Evidence concerning these matters is likely to divert the jury's attention from the charged transactions, which are sufficiently complicated in themselves, to another set of complex transactions.

■ 3. The government argues that evidence of one of the uncharged shelters is "inextricably intertwined" with evidence of a charged shelter because they were marketed to a testifying witness at the same time.[15] But it has not explained why details of the uncharged transaction are necessary to understand the charged transaction.[16] It therefore has failed to show that those details are inextricably intertwined with proof of the charged transaction.

\* \* \*

Accordingly, insofar as the government seeks to adduce evidence of uncharged tax shelters, its motion is denied. The matter may be revisited during trial should the matter then appear in a different light.

*Evidence of Side Payments*

The government seeks to admit evidence of an August 1999 transaction among Larson, Pfaff, and Ruble.[17] Ruble allegedly loaned $100,000 to entities controlled by Larson and Pfaff. Six weeks later, the entities paid Ruble $300,000, an amount purportedly representing repayment of the loan ($100,000) and Ruble's share of the investment profit ($200,000).[18]

■ 1. The government argues that the transaction "furthered the goals of the conspiracy alleged . . . because it served to

**13.** *United States v. Pascarella*, 84 F.3d 61, 73 (2d Cir.1996) citing *United States v. Rosa*, 11 F.3d 315, 333–34 (2d Cir.1993).

**14.** Defendants identify two ways in which these assertions are particularly deficient. *See, e.g.,* Defendants' Response Memorandum in Opposition to Rule 404(b) Motion [DI 894] ("Def. Mem.") at 2; Defendants' Memorandum in Further Opposition to Rule 404(b) Motion [DI 1033] ("Def. Add'l Mem.") at 17–18.

**15.** Government's Memorandum in Further Support of Rule 404(b) Motion [DI 969] ("Gov't Add'l Mem.") at 29.

**16.** The government has made no claim that the uncharged transaction is "crucial information without which the jury will be confused or the government's theory of the case unfairly curtailed." *United States v. Townsend,* No. 06 CR. 34 (JFK), 2007 WL 1288597, at \*2 (S.D.N.Y. May 1, 2007) (quoting *United States v. Newton,* No. 01 Cr. 635, 2002 WL 230964, at \*3 (S.D.N.Y. Feb. 14, 2002)).

**17.** Gov't Mem. at 26–27.

**18.** *Id.* at 26.

reward a member whose continued opinion-writing activities were integral to the operation of the scheme."[19] "An act that is alleged to have been done in furtherance of the alleged conspiracy ... is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged."[20] The transaction therefore is not "other act" evidence under Rule 404(b) with respect to Count One, which charges conspiracy to defraud the United States. This conclusion, however, does not obviate the Rule 403 analysis.

■ The government argues that this evidence is probative of the conspiracy because the transaction rewarded Ruble for his opinion writing. But the proffered evidence only proves that money was exchanged.[21] It does not establish that the $300,000 payment in substance was a payoff as opposed to a legitimate investment gain, although gains of such magnitude in such a short period certainly do not occur every day. Hence, the probative value of the evidence is not especially strong. And, while the government is right that proof of the bare facts would be simple,[22] that does not end the analysis. The government will have to deal also with defendants' contention that the sum paid to Ruble was a "return on investment."[23] There is risk that such evidence would confuse the issues, cause undue delay, and be used for an improper purpose. But it is not possible to assess the probative value of this evidence outside the context of trial, and therefore not possible to make a definitive ruling as to its admissibility.

2. The government argues also that the transaction would be probative of knowledge or intent on Counts Forty–One and Forty–Three, which charge evasion of Ruble's taxes, because the transaction "could properly be viewed as part of a criminal understanding among the three that no tax reporting documents would be filed in connection with the payments made to Ruble."[24]

■■ In order to establish that other act evidence is probative of knowledge or intent, the government must show that the other act is sufficiently similar to the charged act to "permit the inference of knowledge or intent advocated" by the government.[25] The government suggests the transaction is similar to the acts charged because (1) Larson and Pfaff did not report to the IRS that money was paid to Ruble, and (2) Ruble did not report the income to his law firm. But the transaction differs from the charged payments: (1) Ruble reported the transaction income to the IRS,[26] and (2) Larson and Pfaff had no reporting obligation.[27] Further, the government does not suggest that the payments charged in the indictment were made through a transaction like the August 1999 transaction. Based on the few

19. *Id.* at 27.

20. *United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir.1992); *see also United States v. Gotti*, No. 02 CR 743, 2004 WL 2423799, *4 (S.D.N.Y. Oct. 29, 2004); *United States v. Baez*, 349 F.3d 90, 93 (2d Cir.2003); *United States v. Thai*, 29 F.3d 785, 812 (2d Cir.1994).

21. Gov't Mem, at 28.

22. *Id.*

23. Def. Mem. at 48.

24. Gov't Mem. at 27.

25. *United States v. Aminy*, 15 F.3d 258, 260 (2d Cir.1994).

26. Gov't Mem. at 28.

27. In the charged payments, the government alleges that Pfaff and Larson failed to report the payments despite an obligation to report. *Id.* at 20. But the government does not argue that Pfaff and Larson had an obligation to report the uncharged payments.

similarities identified by the government, the Court concludes that evidence of the uncharged payments has little or no probative value.[28]

■ The government argues that the prejudicial effect of this evidence would be small and that proof of this transaction will be simple.[29] But in order to support the government's proposed inference of intent or knowledge, the government first must establish that the August 1999 transaction did not, in fact, involve a return on investment. The risk that this evidence would confuse the issues, cause undue delay, and be used for an improper purpose outweighs substantially its probative value.

\* \* \*

Accordingly, insofar as the government seeks to admit evidence of the August 1999 transaction, its motion is denied without prejudice to revisiting the issue during trial should the matter then appear in a different light.

*Evidence of Personal Tax Evasion*

*1. Ruble*

The government seeks to admit evidence that Ruble failed to report to the IRS income received from tax shelter promoters in 1996 and 1997 to show knowledge or intent in the charged counts of personal tax evasion.[30]

■ When other act evidence is offered to show intent, the preferred practice often is to delay a decision on admissibility until intent is put in issue.[31] This "enables the trial judge to determine whether [intent] ... is really in dispute and, if so, to assess the probative worth of the evidence on this issue."[32] The government argues that intent already is in dispute because it is an element of the government's burden, and Ruble has not expressed with "sufficient clarity" a decision not to dispute intent.[33] But a Second Circuit decision suggests that, in a prosecution for tax evasion, other act evidence is admissible in the government's case-in-chief to show intent only if the defendant indicates that he will challenge intent.[34]

Even if intent clearly were contested, the probative value of the uncharged evasion is uncertain. The government identifies numerous tax evasion prosecutions in which evidence of uncharged evasion was admitted to show willfulness.[35] These

---

28. *See United States v. Gordon,* 987 F.2d 902, 908 (2d Cir.1993) (quoting *United States v. Corey,* 566 F.2d 429, 431 (2d Cir.1977)) ("probative value ... depends largely on whether or not there is a 'close parallel between the crime charged and the acts shown.'").

29. Gov't Mem. at 28.

30. *Id.* at 17. Ruble is charged with personal income tax evasion in 1998–2001. Sup. Indict. (DI 57) ¶¶ 81–83.

31. *See,* e.g., *United States v. Figueroa,* 618 F.2d 934, 939 (2d Cir.1980); *United States v. Bok,* 156 F.3d 157, 165–66 (2d Cir.1998); *United States v. Rodriguez,* 943 F.2d 215, 218 (2d. Cir.1991).

32. *Figueroa,* 618 F.2d at 939.

33. Government's Reply Memorandum in Support of Rule 404(b) Motion [DI 907] ("Gov't Reply") at 37.

34. *See Bok,* 156 F.3d at 166 (admission of other act evidence appropriate where "before admission ..., [defendant] had proposed instructions that concerned intent," and challenged intent in the cross examination of a witness). Other cases have found that "the nature of a defense ... may reveal that '[k]nowledge and intent, while technically at issue, [are] not really in dispute.'" *United States v. Colon,* 880 F.2d 650, 656 (2d Cir. 1989) (quoting *United States v. Benedetto,* 571 F.2d 1246, 1249 (2d Cir.1978)).

35. *See,* e.g., *United States v. Magnus,* 365 F.2d 1007, 1010 (2d Cir.1966); *United States v. Turoff,* 853 F.2d 1037, 1045–46 (2d Cir.1988);

cases, however, establish only that uncharged acts of evasion may be admitted to show intent. They do not require admission or dictate an outcome in the Rule 403 analysis.

 The Court's preliminary view of this evidence is that it has low probative value and a high risk of unfair prejudice. Ruble is charged personal tax evasion in four different years. The four years of charged evasion tends to decrease the likelihood of an innocent explanation. The additional decrease provided by two uncharged acts of tax evasion is likely to be small. This evidence also risks unfair prejudice, including confusion of the issues, undue delay, and that it is used for an impermissible purpose against Ruble or his co-defendants. In all the circumstances, the Court will defer a ruling on this point until it is clear that intent is in issue and the significance of the evidence is clearer.

## 2. Pfaff

The government seeks to admit evidence that Pfaff failed to report and untimely reported income to the IRS, arguing that it is admissible to show knowledge or intent in the charged counts of tax evasion.[36] The government refers to Pfaff's failure to report income and untimely reporting of income as "evasion," but it does not explain what was involved in those acts.[37]

The government relies entirely on other cases in which uncharged evasion was admitted in a tax evasion prosecutions to argue that Pfaff's charged and uncharged acts are sufficiently similar to permit an inference of intent or knowledge.[38] This is entirely unhelpful. That an inference of knowledge or intent existed in another tax case does not establish that the inference exists in this case.

 In the absence of any articulated similarities, the government is seeking an impermissible character inference—that someone who evaded taxes is likely to evade taxes again. And obvious differences between the charged and uncharged acts undermine any inference of intent or knowledge. The uncharged acts consist of failing to report or untimely reporting of income,[39] but Count 33 charges evasion by sheltering income through a sophisticated tax shelter (BLIPS), and Counts 41 and 43 charge evasion of another person's taxes.

 The slight, if any, probative value of this evidence is outweighed substantially by its risk of prejudice. The government's claim that this evidence would require "neither significant additional time nor documentary evidence"[40] is belied by the government's footnote acknowledging that the government would have to prove not just that Pfaff received the funds, but that the funds constituted fee income to him.[41] Further, proof of the uncharged acts would risk unfair prejudice by introducing

*United States v. Ebner,* 782 F.2d 1120, 1126 n. 7 (2d Cir.1986).

**36.** Gov't Mem. at 14, 20. Pfaff is charged with personal income tax evasion with respect to his own tax liabilities in 1999 and Ruble's tax liabilities for 1998 and 2000. Sup. Indict. ¶¶ 33, 81, 83.

**37.** Untimely reporting could be as innocent as a forgetful taxpayer mailing his taxes a day late.

**38.** Gov't Mem. at 20–21; Gov't Reply Mem. at 40–41.

**39.** Gov't Mem. at 14–15.

**40.** *Id.* at 21–22.

**41.** Pfaff maintains that his tax treatment was proper. Def. Mem. at 42–43.

evidence that the alleged fee income arose from uncharged, allegedly fraudulent shelters.

The motion to admit evidence of Pfaff's uncharged evasion is denied.

### 3. Greenberg

The government seeks to admit evidence that Greenberg failed to report income to the IRS and fraudulently avoided paying tax on certain income,[42] arguing that it shows Greenberg's state of mind in, or is inextricably intertwined with, the charged conduct.

The government asserts that Greenberg's "tax misconduct will speak volumes" about his intent,[43] but has not seriously explained why it has so concluded. It points to one similarity between the charged and uncharged acts: both acts involved the same nominee entities.[44] Absent any explanation of how this similarity is probative of intent or knowledge, this single similarity is not sufficient. Because the government has not explained how an inference of knowledge or intent could be drawn from the uncharged acts of evasion, it has not met its burden of establishing admissibility.

Even if the Court were to assume that this evidence were probative of Greenberg's intent, the substantial risk of prejudice might justify exclusion under Rule 403. This evidence would risk substantial prejudice to Greenberg and his co-defendants, including confusion of the issues, undue delay, and that the jury will use the evidence for an impermissible purpose against Greenberg or his co-defendants.

The government argues also that Greenberg's failure to report income is inextricably intertwined with the charged conduct because he received the income through the sale and implementation of charged shelters.[45] The government has not explained, or even argued, that evidence Greenberg's evasion is "crucial information without which the jury will be confused or the government's theory of the case unfairly curtailed." [46] While it is conceivable that Greenberg's receipt of income from the charged shelters might be inextricable from proof of the shelters, the government does not explain how Greenberg's evasion with regard to that income is inextricably tied in.

The motion to admit evidence of Greenberg's uncharged evasion is denied.

### Conclusion

For the foregoing reasons, to the extent not abandoned or rendered moot, the government's motion to admit "other act" evidence under Rule 404(b) [Docket Item 809] is denied. The denial is without prejudice to the extent indicated above.

SO ORDERED.

---

42. The government alleges that Greenberg avoided paying tax in two ways: (1) by falsely claiming he received money as a nominee, and (2) falsely deducting passive losses. Gov't Mem. at 15–16; Gov't Reply Mem. at 43.

43. Gov't Mem. at 23.

44. *Id.* at 22–23.

45. *Id.* at 23.

46. *United States v. Townsend*, No. 06 CR. 34 (JFK), 2007 WL 1288597, at *2 (S.D.N.Y. May 1, 2007) (quoting *United States v. Newton*, No. 01 Cr. 635, 2002 WL 230964, at *3 (S.D.N.Y. Feb. 14, 2002)).